IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

CAIN V. CAIN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

LINDSEY T. CAIN, APPELLEE,

V.

PAUL S. CAIN, APPELLANT.

Filed February 1, 2022.    No. A-21-068.

Appeal from the District Court for Douglas County: GARY B. RANDALL, Judge. Affirmed.

Matthew Stuart Higgins, of Higgins Law, for appellant.

John A. Kinney, Jill M. Mason, and Samantha M. Robb, of Kinney Mason, P.C., L.L.O., for appellee.

PIRTLE, Chief Judge, and RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Paul S. Cain appeals the decree entered by the Douglas County District Court dissolving his marriage to Lindsey T. Cain. Paul claims the district court erred in its valuation of his 50-percent interest in Absolute Roofing Omaha, LLC (Absolute Roofing). He also challenges the court's award of alimony and attorney fees. Finding no abuse of discretion, we affirm.

## II. BACKGROUND

Paul and Lindsey were married in December 2005, and they have five children who were born between 2006 and 2014. In 2009, the parties moved to Africa for mission work, and in 2011, they returned to Omaha, Nebraska, after Lindsey began to feel overwhelmed with their living situation in Africa. Following their return, Lindsey primarily took care of the parties' children, which included homeschooling for a time, although she worked 1 or 2 days per week as a nurse at

a women's center. Paul maintained full-time employment, and he began working in the roofing business in 2013. After a year in the industry, he formed his own roofing business, Absolute Roofing, with two other individuals in 2014. By that time, the parties had moved to Elkhorn, Nebraska, to enroll their children in public school. The parties physically separated in early 2018, and Lindsey left her position at the women's center shortly thereafter.

Lindsey filed a complaint for dissolution on July 11, 2018, and Paul subsequently filed an answer and "Cross-Complaint" on September 5. The district court entered a temporary order on September 13, awarding the parties temporary joint legal and physical custody of their five children and ordering Paul to pay $3,250 per month in temporary child support and $3,750 per month in temporary alimony. At some point prior to trial, Lindsey returned to school to pursue a bachelor's degree in nursing, but she was not employed at the time of trial.

Trial was held over the course of 2 days in January 2020, and an additional day in May. During the course of trial, the parties reached agreement on several matters, including custody, parenting time, homeschooling, child support, childcare, health insurance, uninsured medical expenses and other direct expenses for the children, allocation of the children's tax exemptions and tax credits, and the valuation and division of most of the parties' assets. The remaining issues to be addressed at trial were the valuation of Paul's interest in Absolute Roofing and the determinations of alimony and attorney fees. Evidence was adduced regarding these issues. Each party had retained an expert witness regarding the valuation of Absolute Roofing, and the record includes the experts' testimonies and reports received at trial. We briefly observe that Matthew Stadler, the expert retained by Lindsey, estimated Paul's interest in Absolute Roofing to be worth $2,525,000. Conversely, Aaron Pryor, the expert retained by Paul, valued Paul's interest in Absolute Roofing to be worth $494,000. Stadler additionally provided an alternative valuation of $1,830,500 during the course of his testimony. We will discuss this evidence in further detail in our analysis below.

The district court entered a decree dissolving the parties' marriage on December 23, 2020. The court incorporated the parties' agreement into the decree, awarding joint legal and physical custody of the children to Paul and Lindsey pursuant to the parties' parenting plan. The parties stipulated to Paul's monthly gross income being $50,400 for child support purposes. Lindsey's gross monthly income was stipulated to be $4,680, "based upon $30 an hour at a 36-hour workweek." Adopting these income figures, the court ordered Paul to pay Lindsey $3,662 per month in child support for five children and divided expenses such that Paul would be responsible for 87 percent of the children's reasonable and necessary direct expenses, daycare expenses, and uninsured health care expenses. The court adopted Stadler's alternative valuation and determined the value of Paul's interest in Absolute Roofing to be $1,830,500. Pursuant to the division of the marital estate, the court ordered Paul to pay Lindsey an equalization payment of $1,008,221. The decree additionally awarded Lindsey $3,750 per month in alimony for 60 months and $7,500 in attorney fees.

Following entry of the decree, Lindsey filed a "Motion to Clarify and/or Motion for New Trial." The district court denied this motion in an order entered on January 19, 2021. Paul thereafter timely filed this appeal.

## III. ASSIGNMENTS OF ERROR

Paul claims, restated, that the district court abused its discretion in (1) its valuation of Absolute Roofing, (2) its award of alimony to Lindsey, and (3) its award of attorney fees to Lindsey.

## IV. STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Doerr v. Doerr*, 306 Neb. 350, 945 N.W.2d 137 (2020). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.* A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## V. ANALYSIS

### 1. VALUATION OF ABSOLUTE ROOFING

At contention in this case is the valuation of Paul's interest in Absolute Roofing. Paul, together with two other individuals, formed Absolute Roofing in 2014 during the course of the parties' marriage. As a business, Absolute Roofing engages in the sale of roof repair services provided by third party subcontractors, primarily in response to roof damage caused by hailstorms in eastern Nebraska. Paul has a 50-percent ownership interest in Absolute Roofing, and there is presently one other co-owner, Keith Gregerson, who is not a party to this action. Paul also formed other companies that performed other roles and services, such as Dotzler Siding, LLC; Everseal Roofing; PSC KEG, LLC; and several holding companies.

Paul contends the district court erred in adopting Stadler's valuation and valuing his interest in Absolute Roofing at $1,830,500. We will examine the expert witnesses' testimony and reports before we address Paul's assigned error on this issue.

### (a) Stadler Valuation

Stadler is a certified public accountant (CPA) who provides professional business valuation and tax services. He has performed approximately 500 business valuations. Stadler testified that "[i]n the broadest sense, business valuation is a forward-looking discipline." In explaining a "capitalization of earnings approach" to valuing a company, Stadler stated that a present value is determined by first estimating what earnings will be "going forward into perpetuity." This calls for reviewing a company's financial history and considering whether a company's profits or losses are expected to "recur into the future." "[I]n business valuation, we're trying to get to what the company is regularly going to produce." In Stadler's opinion, "both of us [experts] are making a judgment about what we expect the future to hold." Stadler reached the conclusion that the "three most recent years are probably what's most likely to recur." Stadler also used the "asset approach" during the course of his valuation as a supporting calculation, and this approach examines the "value of the assets of the business less liabilities" to determine the value of the business. Stadler's valuation appraised Absolute Roofing's fair market value as of December 31, 2018. His final

valuation report, marked as exhibit 154, was received at trial, and we note that Stadler revised his valuation prior to this final report.

The information available to Stadler included Absolute Roofing's financial statements from 2014 until 2018, as well as the tax returns for various entities in which Paul held an ownership interest. According to his report, Absolute Roofing's total revenues were $3,992,426 in 2014, $4,141,389 in 2015, $12,264,178 in 2016, $7,495,444 in 2017, and $4,660,746 in 2018. We note that although the experts relied on Absolute Roofing's financial statements to determine its annual revenues, each expert's valuation uses different revenue totals and accompanying expenditures.

In applying the income approach, Stadler accounted for the various expenses incurred by Absolute Roofing to estimate an approximation of its "after tax cash flow." Such expenses included an item labeled "management fees." These expenses totaled $271,000 in 2015, $777,955 in 2016, $948,120 in 2017, and $2,259,528 in 2018. According to Stadler's testimony, these management fees reflected amounts paid to PSC KEG, a business entity "used as a payroll paying entity" by Paul and Gregerson. It was Stadler's opinion that PSC KEG was used as a vehicle "to shift income from one entity to the other which results in a tax savings." Stadler's report concluded that, based on PSC KEG's tax returns, this "management fee" generally contained "[r]evenue from Absolute Roofing," a "[d]eduction for officer compensation," a "[d]eduction for payroll taxes related to officer compensation," a "[d]eduction for employee benefits related to officer compensation," and "[o]ther minor deductions." Stadler accounted for this arrangement by "bring[ing] [the management fees] back into Absolute Roofing" "as if they did not occur." He pointed out that Pryor did the same thing.

To account for the officer compensation and related deductions in the management fees, Stadler assigned annual salaries of $150,000 to Paul and Gregerson. These amounts, as well as the related payroll tax liability and employee benefits, were treated as expenses when estimating Absolute Roofing's cash flows. Stadler assigned these salary figures based on his review of "information from the Bureau of Labor Statistics" and information from his present business clients who were also in the roofing business. Stadler testified that he had to factor in multiple job positions in determining Paul's income because Paul had multiple roles in the structure of Absolute Roofing and would therefore "wear different hats as a business owner" depending on the role he was filling. As an aside, we note that Paul testified that his 2019 "W-2 wages" totaled $144,000 without factoring in his tax liability, and these wages also did not include the distributions he received as an owner of Absolute Roofing. Stadler added distributions above the salary amount "back to income," which increased after-tax cash flow and therefore increased the value of the company.

Stadler also testified regarding expenses that he did not factor into his valuation. With respect to Absolute Roofing's 2018 financial statement, he excluded a "Bad Debt Expense" of $295,539 because he believed this expense to be "non-operating[,] . . . probably extraordinary[,] and probably not recurring." He also excluded a 2018 charitable contribution of $16,000 because he concluded that expense was "discretionary." He pointed out that a subsequent owner might not choose to make that charitable contribution, and "it is pretty commonly accepted business valuation theory that when you're going to present a controlling cash flow that you're going to probably zero out charitable contributions as being a discretionary expense."

- 4 -

In determining Absolute Roofing's value under the earnings approach, Stadler used a weighted average of the "after tax cash flow[s]" for the years 2016, 2017, and 2018 calculated from the revenues reported in those years. He weighed 2016, 2017, and 2018 at 33.3 percent each in his calculation. Stadler testified that he did not include 2014 and 2015 in this calculation because his "expectation [was] that 2014 and [2015] revenue levels are not likely to recur." He testified that his review of Absolute Roofing's 2019 financial documents further supported his decision to exclude 2014 and 2015 from his calculation, as he observed that Absolute Roofing's 2019 revenue was "significantly higher" than its 2018 revenue.

Stadler determined Absolute Roofing's "Net of Debt After Tax Cash Flow" to be $917,215. He additionally calculated the "cost of equity capital" for Absolute Roofing to be 19 percent, and from this figure, he derived a capitalization rate of approximately 14.67 percent. By dividing the "Net of Debt After Tax Cash Flow" by the capitalization rate, Stadler calculated Absolute Roofing's "undiscounted value" to be $6,253,521.

Stadler applied additional discount rates to reach a final valuation for Absolute Roofing. He noted that Absolute Roofing was a "50/50 entity" with respect to its ownership, and this structure resulted in the application of a 5-percent discount to Absolute Roofing's value for lack of control. He also applied a 15-percent discount to its value for lack of marketability. These discounts resulted in a final valuation of $5,050,000. From this total value, Paul's 50-percent interest in Absolute Roofing was valued at $2,525,000.

Prior to trial, Stadler reviewed the report prepared by Pryor. During his testimony, Stadler affirmed that he did not factor in "certain nonowner wages paid by PSC KEG to individuals performing services for Absolute Roofing" into his report. He testified that he could not tell from the information provided whether all such wages paid by PSC KEG were solely for services rendered for Absolute Roofing or if any wages were attributable to other companies, stating that he "would need to know how much [is] allocable to Absolute Roofing [and] how much is allocable to other entities" for an accurate calculation. Nevertheless, he completed an additional valuation of Absolute Roofing including the total non-owner wage expenses used in Pryor's report. Exhibit 178, an adjusted income statement for Absolute Roofing that included these amounts, calculated an after tax cash flow of $645,600. From this amount, Stadler provided an alternative valuation for Absolute Roofing of $3,661,000 and testified that the value of Paul's 50 percent interest pursuant to this calculation would be $1,830,500. According to Stadler, this alternative valuation did not supersede the valuation in his report. Rather, he described that the appropriate valuation of Absolute Roofing "depends on whether the Court accepts that the wages for non-owning PSC [KEG] employees are all attributable to Absolute Roofing. If that is a true statement, then it lowers" the value to $1,830,500.

(b) Pryor Valuation

Pryor is not a CPA, but he is a "business valuation expert" who provides professional business valuation services. He has certifications as a Charter Financial Analyst and an Accredited Senior Appraiser. He has performed approximately 40 business evaluations.

Pryor's valuation report also appraised the fair market value of Absolute Roofing as of December 31, 2018. This report, marked as exhibit 161, was received at trial. Pryor's valuation also relied heavily on the earnings approach, which, like Stadler, he described as examining the

"profits . . . or the cash flow that a company generates" into the future. "It's always very forward looking." Pryor added, "It's based on what the company's going to expect in the future. And then the second element is a rate of return or discount rate. We have to estimate what would an investor require to earn on his investment if he bought into the company on an annual rate of return basis." With those two inputs, "we can back into value and say, look, the investor should pay 'X' amount for this business that's going to generate expected cash flows of a certain amount to earn a required rate of return." He also noted, "[E]very valuation we do is a prophecy of the future. So if you're going to look to buy a company today, you're going to say, Well, what I'm going to pay for it today is dependent upon what I think the future profits will be." According to Pryor, "Ultimately, we value companies based on profit, not based on revenue. [S]ometimes it's not as easy as just looking at the profit and loss statement, . . . because there's oftentimes expenses in there that are discretionary in nature or, you know, non-recurring in nature or extraordinary. So we go through this process to adjust those earnings[,] called normalization of earnings."

Pryor also incorporated two additional approaches as "sanity check[s]": the "asset approach," as previously described by Stadler, and the "market approach," which involves "looking at other companies similar to the company you're valuing and figuring out what . . . those companies sell for."

Like Stadler, Pryor examined Absolute Roofing's financial statements from 2014 through 2018. According to his report, Absolute Roofing's total revenues were $4,196,882 in 2014, $4,141,378 in 2015, $12,303,306 in 2016, $7,495,444 in 2017, and $4,685,978 in 2018.

In similar fashion to Stadler, Pryor brought back in the "management fees" paid to PSC KEG by Absolute Roofing and thereafter deducted several expenses to estimate the company's cash flows. Among these expenses included the officer compensation paid to Paul and Gregerson. Pryor testified that he attributed what he believed to be a "normal, reasonable salary level" to Paul and Gregerson, and he assigned a compensation level of $374,470 to Paul and a compensation level of $273,996 to Gregerson. These amounts were derived from 2018 compensation data for "roofing contractors in the state of Nebraska of similar size" to Absolute Roofing. This data came from a "database called Economic Research Institute," which "collects compensation data for benchmarking purposes for valuations or other exercises." Pryor further made deductions for all wages paid by PSC KEG to nonowner employees and corresponding payroll expenses.

In contrast to Stadler, Pryor included the $295,539 "bad debt" and $16,000 charitable contribution. Pryor testified that the bad debt stemmed from a "large commercial roofing job" in 2017 for which Absolute Roofing was not paid and had to "write off 300-and-some-thousand dollars of that job." Pryor decided to include this amount "because maybe every three to four years a big project like that might come around," apparently meaning a similar "write off" would be necessary. With respect to the charitable contribution, Pryor noted that charitable contributions are a "potential adjustment" in business evaluation, but agreed with the suggestion that in this case, the $16,000 contribution "look[ed] like more advertising and development of business and less like just giving money to the church."

Also in contrast to Stadler, Pryor considered Absolute Roofing's revenues and expenses from 2014 through 2018 in his calculation of the company's average cash flow. We note that Pryor testified, however, that when estimating the future earning capacity of a business, "[g]enerally speaking, . . . the more recent years are typically going to be relied upon more so than what

happened five years ago." "There's no exact science to this, by any means." Pryor "applied more weight to the more recent years in the valuation and less weight to what happened four and five years ago." In his report, Pryor assigned 10 percent weight to 2014, 15 percent weight to 2015, 20 percent weight to 2016, 25 percent weight to 2017, and 30 percent weight to 2018. Pryor explained that he placed the greatest weight on the most recent years, but he also drew particular attention to 2016. He testified that "2016 is the year where the big profit was generated," and he described that Absolute Roofing's 2016 and 2017 revenues were the result of the "hailstorms that went through Omaha and Lincoln" during those years. He testified that the 20 percent assigned to 2016 "kind [of] implies . . . that maybe once out of every five years, the company might have a big year like [2016] with a hail type of event and generate that type of profits," but also "implies the four other years [would not] get that type of big benefit."

Based on the foregoing figures, Pryor estimated the company's "ongoing future cash flow" to be $281,000. Pryor additionally determined Absolute Roofing's "cost of equity capital" to be 21.9 percent (compared to Stadler's 19 percent) and further derived a capitalization rate of 19.1 percent (compared to Stadler's 14.67 percent). By dividing Absolute Roofing's "ongoing future cash flow" by the capitalization rate, Pryor estimated that before discounts, Absolute Roofing's value was $1,471,204.

Pryor also applied additional discount rates to calculate Absolute Roofing's value. Like Stadler, Pryor assigned a 5-percent discount due to lack of control. However, Pryor assigned a 20-percent discount due to lack of marketability compared to Stadler's 15-percent discount. Factoring in these discounts, Pryor valued Absolute Roofing at $988,000 and Paul's 50-percent interest in the company at $494,000.

(c) No Abuse of Discretion

As described previously, the district court determined the value of Paul's interest in Absolute Roofing to be $1,830,500, which indicates the court's acceptance of Stadler's alternative valuation which factored in nonowner wages from PSC KEG as applicable solely to Absolute Roofing. Paul only assigns error to the valuation of Absolute Roofing; he does not contest the company's classification as a marital asset or the division of the marital estate. Accordingly, we limit our review to the value of Paul's interest in Absolute Roofing.

As part of the property division, we review the district court's valuation of Absolute Roofing for an abuse of discretion. See *Doerr v. Doerr*, 306 Neb. 350, 945 N.W.2d 137 (2020). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.* Given that this assigned error concerns conflicting expert opinions, we are mindful that when evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017). See, also, *Logan v. Logan*, 22 Neb. App. 667, 859 N.W.2d 886 (2015) (regarding valuation of business interests in dissolution proceedings, trial court weighs credibility of witnesses and evidence and determines what evidence should be given greater weight). This court's primary concern in our review of the district court's valuation is whether that valuation has an acceptable basis in fact and principle. See *Schuman v. Schuman*, 265 Neb. 459, 658 N.W.2d 30 (2003) (trial court's valuation of closely

held corporation in dissolution proceeding is reasonable if it has acceptable basis in fact and principle). See, also, *Shuck v. Shuck*, 18 Neb. App. 867, 806 N.W.2d 580 (2011), *abrogated on other grounds, Stephens v. Stephens*, 297 Neb. 188, 899 N.W.2d 582 (2017).

Paul argues that the district court erred in its valuation of his interest in Absolute Roofing because it adopted Stadler's alternative valuation without "critically analyzing on the record [his] calculations[] and methodology." Brief for appellant at 42. The five differences in Stadler's valuation described by Paul on appeal include: (1) the compensation level of $150,000 assigned to Paul and Gregerson as well as the omission of the tax liability for their compensation and costs associated with the compensation of Absolute Roofing's other employees; (2) the years chosen and the weight assigned to those years in calculating Absolute Roofing's future cash flows; (3) the 19-percent cost of capital used to calculate the capitalization rate; (4) the exclusion of $295,539 in bad debt; and (5) the exclusion of a $16,000 charitable contribution in 2018. Paul directs our attention to the figures and methods used by Pryor in his valuation of Absolute Roofing as a point of comparison.

While Paul details an extensive comparison between the respective methodologies and figures used by Stadler and Pryor, his arguments are ultimately challenges to the weight and credibility given by the district court to each expert's respective report and testimony. As set forth above, both Stadler and Pryor testified extensively, under direct and cross-examination, regarding their respective conclusions and underlying reasoning, and their full reports were provided to the district court for evaluation and comparison. The record also offers no indication that either expert failed to adhere to accepted business valuation standards and practices or of any foundational flaw in the parties' respective valuations.

Having reviewed the record, we give weight to the fact that the district court heard and observed the witnesses in this matter. Although we recognize that Stadler's alternative valuation of Paul's interest at $1,830,500 is substantially larger than Pryor's valuation of $494,000, we are not persuaded that Stadler's valuation was unreasonable such that it lacked an acceptable basis in fact and principle. Rather, the differences Paul highlights on appeal reflect the experts' different perspectives and independent exercise of professional judgment. Even Pryor acknowledged that such valuations are "very forward looking," and there was "no exact science to this." While both parties provided extensive evidence supporting their respective valuations, it is evident that the district court found Stadler's estimation of Absolute Roofing's value to be more credible. It is not our role to second-guess the district court's determinations of weight and credibility when presented with a conflict in plausible evidence. See *Logan v. Logan, supra*. Accordingly, we find the district court did not abuse its discretion in determining the value of Paul's interest in Absolute Roofing to be $1,830,500.

## 2. ALIMONY

Paul claims the district court further abused its discretion in ordering him to pay Lindsey alimony.

As described previously, the parties stipulated, for purposes of child support, Paul's monthly income to be $50,400 and Lindsey's monthly income to be $4,680. Notably, when referred to exhibits 3 and 4, Paul acknowledged during his testimony that he had a gross income in excess of $1.2 million in 2018. Exhibit 4 represented Paul's 2018 total earnings of

$1,260,698.30 as follows: $653,412 from PSC KEG (K-1); $330,450 from Absolute Roofing (K-1); $11,458 from Dotzler Siding (K-1); a loss of $3,109 from PSC KEG Properties, LLC (K-1); and $268,487.30 from PSC KEG (W-2).

In the early years of the marriage, Lindsey earned her associate's degree in nursing while Paul completed his education for his undergraduate and master's degrees. While both parties were employed throughout the marriage, Lindsey worked limited hours so she could take care of the parties' children, including homeschooling them before the parties moved to Elkhorn. At the time of trial, Lindsey had resumed homeschooling one child, and she was also pursuing further education for a bachelor's degree in nursing. Paul provided the majority of the family's financial support throughout the marriage, and his roofing business offered him a flexible work schedule outside of the months from May until August when he would be "inundated" with work.

An estimation of Lindsey's monthly expenses received at trial indicates that her expenses at the time of trial were approximately $9,607.67 per month. These expenses included $2,942 for mortgage payments, real estate taxes, and insurance; $1,440 for food and household supplies; $1,055.61 for her education expenses; and various other expenditures including utilities, insurance, health care, and items such as entertainment and club membership dues.

According to an estimation of Paul's monthly expenses, his expenditures at the time of trial totaled approximately $7,481.89 without including his child support and alimony obligations. These expenses included $650 for mortgage payments, up to $1,230 for food, $560.39 for his car lease, $517 for health insurance, $460 for the children's extracurricular activities, and items such as entertainment and club membership dues. As previously described, the district court ordered Paul to pay $3,662 per month in child support for five children and $3,750 in alimony for 60 months. Including these obligations increases Paul's monthly expenditures to approximately $14,893.89. We also note that through December 2019, Paul had paid $52,000.37 in temporary child support and $53,253.42 in temporary alimony.

The district court concluded that Paul and Lindsey each significantly contributed to parenting their children. However, the court stated that Lindsey "has not had the opportunity during the marriage to pursue" further education in nursing, which would require 3 years to achieve a bachelor's degree. The court deemed this education as necessary for Lindsey to "develop financial independence and provide her with the ability to contribute to support" the parties' children. The court also found that Lindsey's contributions "allowed [Paul] flexibility to develop a successful business enterprise" during the course of the marriage. Drawing on these findings, the district court ordered Paul to pay $3,750 per month in alimony to Lindsey for 60 months.

In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018). In addition, a court should consider the income and earning capacity of each party and the general equities of the situation. *Id.* In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Id.* Alimony is not a tool

to equalize the parties' income, but a disparity of income or potential income might partially justify an alimony award. *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015).

Paul claims that an award of alimony is not warranted in this case. He primarily argues that Lindsey is able to "engage in gainful employment" through her present nursing qualifications and will have "parity of resources" when accounting for the division of the marital estate. Brief for appellant at 45. He further asserts that Lindsey could have pursued further education while the parties were married and could do so now without alimony due to the property equalization and joint custody parenting time.

We also note, like the district court, the professional flexibility provided to Paul by Lindsey's limited work hours during the course of the marriage, especially in light of the parties' decision to homeschool their children during the marriage. In addition to the substantial disparity in income between the parties, Lindsey's reported expenses exceed her imputed income, even when accounting for Paul's child support obligation. It will take time for Lindsey to both complete her schooling and acquire stable employment. Although the equalization payment awarded to Lindsey is substantial, we cannot say the district court abused its discretion in ordering Paul to pay Lindsey $3,750 per month in alimony for 60 months in light of the parties' individual circumstances.

### 3. ATTORNEY FEES

Paul claims the district court erred in awarding Lindsey $7,500 in attorney fees. Paul's argument regarding this matter rests upon the same grounds as his argument against the district court's alimony award, and he asserts that he and Lindsey should be responsible for their own attorney fees.

It has been held that in awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions asked, and the customary charges of the bar for similar services. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014). The award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. See *id.*

According to an affidavit for attorney fees received at trial on January 27, 2020, Lindsey had incurred $21,841.74 in attorney fees as of June 7, 2019. We have reviewed the record, and we conclude the district court did not abuse its discretion in ordering Paul to pay $7,500 in attorney fees.

### VI. CONCLUSION

For the reasons set forth above, we affirm the district court's decree in all respects.

AFFIRMED.